**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PAULO RAMIREZ,                          )
                                        )
        **Plaintiff,**                    )
                                        )       **No. 08 C 5272**
v.                                      )
                                        )       **Judge Ruben Castillo**
STATE OF ILLINOIS DEPARTMENT            )
OF HUMAN SERVICES,                      )
                                        )
        **Defendant.**                   )

### MEMORANDUM OPINION AND ORDER

Paulo Ramirez ("Ramirez") brings this action to address alleged unlawful employment

practices by the State of Illinois Department of Human Services ("IDHS"). Ramirez alleges that

IDHS discriminated against him in violation of the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. § 12101 *et seq.* (R. 18, First Am. Compl.) Presently before the Court is

IDHS's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (R.

51, Def.'s Mot. for Summ. J ("Def.'s Mot.").) For the reasons stated below, the motion is

granted.

### RELEVANT FACTS[1]

IDHS's Human Capital Development division provides the state's residents with a

variety of public aid programs, including direct assistance programs that administer food stamps

and medical benefits. (R. 53, Def.'s Facts ¶ 3.) IDHS employs case workers to help clients apply

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 Statements. (R.
53, Def.'s Local Rule 56.1 Statement of Material Facts ("Def.'s Facts"); R. 56, Pl.'s Local Rule
56.1 Statement of Material Facts ("Pl.'s Facts"); R. 62, Def.'s Local Rule 56.1(a) Response to
Pl.'s Local Rule 56.1 Statement of Material Facts ("Def.'s 56.1 Resp.").)

for these benefits.[2] (*Id.* ¶ 4.) A prerequisite to employment as a case worker is the successful completion of the "Social Services Career Trainee" ("SSCT") program. (*Id.* ¶ 6.) SSCTs are probationary employees who receive on-the-job training for six to twelve months to develop the skills necessary to become case workers. (*Id.* ¶¶ 6, 8.) These skills include explaining and interpreting program policy and eligibility requirements, assessing client eligibility and making appropriate referrals. (R. 53-1, Tab B, Ex. 2, SSCT Position Description.) To qualify as an SSCT a candidate must possess a minimum educational requirement in a field of social services and the ability to speak Spanish at a colloquial level. (R. 56, Pl.'s Facts ¶ 82.) Upon successful completion of the program, the SSCT is certified as a case worker. (R. 53, Def.'s Facts ¶¶ 8-9.) If a SSCT is not certified within this probationary period, his employment with IDHS is terminated. (*Id.* ¶ 9.)

Ramirez has four post-graduate degrees and suffers from physical ailments related to his humerus bone, Parkinson's disease, diabetes and has difficulties with his vision. (R. 56, Pl.'s Facts ¶¶ 81, 86, 90, 94.) On August 16, 2005, Ramirez was hired by IDHS as a SSCT in the South Suburban Office (the "Office"). (R. 53, Def.'s Facts. ¶ 10.) Another SSCT, Ignacia Chajon ("Chajon"), was also hired and started in the Office on the same day as Ramirez. (*Id.* ¶ 11.) Case Manager Michelle Brandon ("Brandon") was responsible for training, supervising and evaluating the performance of the SSCTs in the Office. (*Id.* ¶ 12.) Both Ramirez and Chajon began their training by helping out at the Office's intake desk and received group training on food stamp application procedures. (*Id.* ¶¶ 14-15.) Beginning in October 2005, Brandon gave Ramirez and Chajon a few simple food stamp applications to process, but according to IDHS,

_____

[2] Each case worker manages a caseload of approximately 1,000 cases. (*Id.* ¶ 5.)

Ramirez was unable to correctly follow the training he had been given and process the basic applications. (*Id.* ¶ 16.) As a result, Brandon arranged weekly one-on-one training with processing experts for Ramirez throughout December 2005. (*Id.* ¶ 17.)

In late 2005, Brandon noticed that Ramirez was having difficulty with his left shoulder, and asked Jocelyn Dyson ("Dyson"), a specialist for IDHS's Bureau of Job Accommodation ("BJA"),[3] to visit the Office and meet with him. (*Id.* ¶ 25.) Ramirez told Dyson about an arm injury he had suffered a few years earlier and indicated that his arm was affecting his training. (*Id.*; R. 56, Pl.'s Facts ¶ 87.) Dyson then discussed the process by which he could seek a reasonable accommodation. (R. 53, Def.'s Facts. ¶ 25.) On December 8, 2005, Ramirez submitted an official request for reasonable accommodation. (*Id.* ¶ 26.) In this request, he indicated that his "left shoulder [was] incapacitated," which limited his major life activity of "working." (*Id.*) Upon receipt of the request, Dyson returned to the Office in early 2006 to meet with Ramirez and get more information. (*Id.*) During that visit, Ramirez explained that he also had problems with his vision. (*Id.*) On January 11, 2006, after a review of Ramirez's request and accompanying medical information, the BJA concluded that the documentation did not substantiate a shoulder or visual disability for purposes of his accommodation request, but continued to seek and obtain information from Ramirez and his medical providers regarding his claimed limitations. (*Id.* ¶¶ 27-28.)

By January 2006, Chajon had made substantial progress as an SSCT. (*Id.* ¶ 18.) She was able to handle more complex food stamp cases and had also began to issue medical cards. (*Id.*) In her February 2006 evaluation, Brandon told Chajon that she was meeting all of IDHS's

---

[3] The BJA is a bureau within IDHS that receives, evaluates, and issues decisions on requests for reasonable accommodation under the ADA. (*Id.* ¶ 25.)

general expectations and most of the targeted objectives for the position. (*Id.* ¶ 24.) In contrast, Brandon thought that Ramirez's skills had not adequately developed. (*Id.* ¶ 19.) In his January 26, 2006 performance evaluation, Brandon indicated that Ramirez "needed improvement" in five of eight categories of general expectations and did not meet 60% of the targeted objectives for the position. (*Id.* ¶ 22.)

Ramirez claims that his performance did not progress because he was taken away from his SSCT duties and had to work at the Office's intake desk, which left him with little time to do his work. (R. 56, Pl.'s Facts ¶ 32.) IDHS, however, claims that Ramirez would make mistakes in the processing of food stamp applications and "needed one-on-one assistance on an almost daily basis." (R. 53, Def.'s Facts ¶ 32.) After six months as an SSCT, IDHS asserts that Ramirez was only able to complete two or three applications per week, with errors in his work, while Chajon could complete five to eight applications per day. (*Id.* ¶¶ 34-35.) Chajon was certified for permanent employment as a case worker in April 2006. (*Id.* ¶ 37.)

On March 27, 2006, the BJA issued a "Reasonable Accommodation Request Response" to Ramirez regarding his December 8, 2005 request for accommodation. (*Id.* ¶ 29.) The response approved accommodations for Ramirez's shoulder impairment, but stated that the medical information provided did not substantiate a visual disability under the ADA. (*Id.*) Subsequently, on April 5, 2006, Ramirez received a one-handed keyboard and an adjustable keyboard tray as accommodations for his shoulder impairment.[4] (*Id.* ¶ 31.) That same day,

---

[4] Ramirez claims that the keyboard was "taken away for three (3) to four (4) weeks" after it was given to him. (R. 56, Pl.'s Facts ¶ 90.) IDHS, however, denies this claim, which Ramirez supports through his deposition testimony that "[Brandon and Allgood] left [him] stranded for three or four weeks" when they "didn't pay attention to [his] concerns . . . about the right-handed keyboard." (*Id.*; R. 62, Def.'s 56.1 Resp. ¶ 90.)

Brandon met with Ramirez and again explained that he was not meeting IDHS's expectations. (*Id.* ¶ 38.) Following this meeting, IDHS claims that Ramirez's performance still did not progress and he continued to require one-on-one training. (*Id.* ¶ 39.)

In late May 2006, Brandon recommended that Doleres Allgood ("Allgood"), the Office Administrator, not certify Ramirez as a case worker and terminate his employment. (*Id.* ¶¶ 40, 43.) Brandon prepared a performance evaluation detailing the reasons for discharge. (*Id.* ¶¶ 44-45.) On June 1, 2006, Ramirez was given a copy of this evaluation, on which he indicated that he did not agree with Brandon's assessment of his performance. (*Id.* ¶ 47.) Ramirez claims that the evaluation "was more tailored to [his] dismissal than anything else," and that Brandon did not give him credit "for learning." (*Id.*) That same day, Brandon and Allgood met with Plaintiff to tell him that he was not being certified as a case worker and that his last day of work would be June 15. (*Id.* ¶ 48.)

On June 2, 2006, Ramirez called the BJA and informed the department of his discharge and asked for an extension of his training period because he was "legally blind" according to a new eye exam he had obtained. (*Id.* ¶ 49.) The BJA representative told Ramirez to submit a new accommodation request and the supporting medical information. (*Id.*) The BJA then received an eye exam report for Ramirez dated March 21, 2006, which indicated that his vision was much worse than earlier medical information indicated.[5] (*Id.* ¶ 50.)

The BJA received Ramirez's second request for reasonable accommodation on June 7, 2006. (*Id.* ¶ 52.) The request indicated that Ramirez's "humerus [bone] and vision" affected his

---

[5] The report did not contain the name, office location, or telephone number of the medical professional who conducted the examination. (*Id.* ¶ 50.)

major life activities of "typing and seeing closely." (*Id.*) On June 8, 2006, the BJA representative verbally clarified with Ramirez (and noted on his accommodation request form) that he was seeking an adaptive computer and to have his training period extended to August 16, 2006. (*Id.*)

Due to the significant differences between the newly submitted report and his previous vision report, the BJA decided to secure a third diagnosis of Ramirez's vision before issuing a decision on his second accommodation request. (*Id.*) Accordingly, on June 9, 2006 and June 13, 2006, Ramirez was evaluated by a third party organization, the Chicago Lighthouse for the Blind. (*Id.* ¶ 51.) On June 16, 2006, the BJA directed IDHS to extend Ramirez's training period for one month so that the department could evaluate his request for reasonable accommodation. (*Id.* ¶ 53.) Allgood then called Ramirez and told him to report back to work. (*Id.*)

On June 19, 2006, after Ramirez returned to work, he submitted a third request for accommodation, in which he described his disability as "physical, visually impaired" and asked for a "transfer to an office to work in North Chicago [because] it is difficult to transport from home to work." (*Id.* ¶ 54.) This request, however, was denied on July 26, 2006. (*Id.* ¶ 69.) The BJA concluded that Ramirez provided no information to support a finding that he suffered a disability that interfered with his ability to do the job without a transfer. (*Id.* ¶ 69.)

On June 20 and 21, representatives from the Chicago Lighthouse for the Blind and IDHS's Department of Rehabilitation Services installed a larger monitor and a magnifying device at Ramirez's desk and a "Zoom Text"[6] program on his computer. (*Id.* ¶ 55.) IDHS claims that

---

[6] "Zoom Text" is a software program that allows a user to increase the size of text on the computer screen. (*Id.* ¶ 55.)

Ramirez's performance did not improve with these accommodations and that he continued to require one-on-one training. (*Id.* ¶¶ 58-60.) Brandon and Stephanie Ford, a specialist that provided one-on-one training to Ramirez, both wrote reports detailing his deficiencies. (*Id.*) Ramirez, however, disputes these reports, claiming that they were created to give an illusion of a valid reason for terminating him and that the decision to terminate him had already been made in January. (R. 56, Pl.'s Facts ¶ 58-60.) In support of that contention, Ramirez points to a January 5, 2006 memorandum that Allgood wrote to the BJA stating:

> I honestly do not think he will be able to perform the job assignment no matter what all we give him . . . I just need to show we did all we could to see if he could do the job before we deny his certification. He has not done much for the past three months, but I know if I do not certify him, they are going to file a discrimination suit. That's why I assigned him to Ms. Brandon to show we did all we could to assist him.

(*Id.* ¶ 99.)

On July 10, 2006, Brandon met with Ramirez again to discuss issues with his performance. (R. 53, Def.'s Facts ¶ 61.) Brandon indicated that from June 15 to July 10, Ramirez had only completed five food stamp applications and none of them were correctly processed and that much of Ramirez's work had to be re-directed to other case workers. (*Id.* ¶ 62.) From July 12 to July 17, Ramirez received one-on-one training from staff development specialist Asia Nash ("Nash"). (*Id.* ¶ 63.) At the end of the week, Nash concluded that "Ramirez cannot perform [the] duties of a case worker and is not suited for this position." (*Id.*) Again, Plaintiff disputes this assessment, and argues that Nash's report was only created to validate IDHS's decision to fire him. (R. 56, Pl.'s Facts ¶ 63.)

On July 24, 2006, Allgood notified the BJA that she would not be recommending Ramirez for certification because his "performance had not improved with the use of accessible

technology nor has [he] demonstrated the skills required for this position." (*Id.* ¶ 65.) On July 25, 2006, the BJA informed Allgood that Ramirez did not qualify as visually disabled under the ADA based on the Chicago Lighthouse for the Blind's report and issued a response denying his June 7 request.[7] (*Id.*) On July 28, 2006, Brandon prepared a third evaluation of Ramirez's performance.[8] (*Id.* ¶¶ 66-67.) Specifically, Brandon indicated that Ramirez: did not interview customers within a reasonable period of time; sent customers away without the correct applications; did not provide appropriate referrals to customers; put applications in his desk drawer without registering them; and accumulated a backlog of work that had to be re-directed to other case workers. (*Id.*) As a result, Brandon concluded that "[Ramirez] has not developed nor demonstrated the skills, knowledge and understanding necessary for [the case worker] position." (*Id.* ¶ 66.) That same day, Brandon and Allgood met with Ramirez and told him that he was being discharged because he did not meet the objectives of the position. (*Id.* ¶ 70.)

Although Ramirez suffers from Parkinson's disease, he stated that this illness does not limit him in any way. (*Id.* ¶ 77; R. 56, Pl.'s Facts ¶ 77.) Ramirez admits that although he suffered discomfort while performing his job duties, he claims that this discomfort was addressed by the adaptive equipment that he was given and he did not need anything else to perform the job. (R. 53, Def.'s Facts ¶ 78.)

---

[7] The Chicago Lighthouse for the Blind's report regarding Ramirez's vision examination was received by the BJA on July 5, 2006, and indicated that Ramirez's corrected vision was 20/40 and 20/50. (R. 53, Def.'s Facts ¶ 64.)

[8] Again, Ramirez did not concur with the assessment, claiming that his performance was only deficient because he had to work at the intake desk and spend extended periods of time filing. (*Id.* ¶ 69; R. 56, Pl.'s Facts ¶ 69.)

## PROCEDURAL HISTORY

On September 16, 2008, Ramirez filed a *pro se* complaint against IDHS in this Court. (R. 1, Compl.) After being appointed counsel, Ramirez amended his complaint on January 22, 2009. (R. 13, Min. Order; R. 18, First Am. Compl.) On January 25, 2010, IDHS moved for summary judgment. (R. 51, Def.'s Mot.) IDHS claims that Ramirez "could not perform the essential functions [of his position] with or without an accommodation" and therefore "his claims are beyond the scope of the ADA." (R. 52, Def.'s Mem. of Law in Support of Its Mot. for Summ. J. "(Def.'s Mem.")" at 1.) Further, IDHS argues that the undisputed facts show that: (1) "Ramirez was not meeting IDHS's legitimate expectations"; (2) his "disability played no role in either employment decision at issue"; and (3) IDHS had "legitimate, non-pretextual reasons" to discharge Ramirez. (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In ruling on a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all doubts in the non-moving party's favor. *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once a moving party has met this burden, the non-moving party must "set out specific facts showing a genuine issue for trial."

9

Fed. R. Civ. P. 56(e). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The non-moving party must show that there is evidence upon which a jury reasonably could find for the plaintiff." *Wheeler*, 539 F.3d at 634.

## ANALYSIS

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In addition, the ADA requires employers to make "reasonable accommodations" for the disabilities of qualified individuals. *Id.* § 12112(b)(5)(A). Thus, there are two distinct categories of discrimination under the ADA: disparate treatment claims and failure to accommodate claims. *Timmons v. Gen. Motors Co.*, 469 F.3d 1122, 1125 (7th Cir. 2006). In this case, Ramirez alleges that IDHS terminated him because of his disability and failed to accommodate his request for a transfer. (*See* R. 18, First Am. Compl.)

The ADA was "designed to prevent discrimination against disabled persons who are otherwise qualified for a job, but as a result of a disability are unable to perform the job's essential functions without reasonable accommodations." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). Therefore, only "qualified individuals" with a disability are protected under the ADA. *Id.* IDHS first argues that Ramirez's claims of discrimination under both categories of discrimination fail because he is not a qualified individual with a disability for purposes of the ADA. (R. 52, Def.'s Mem. at 9-12.)

When determining whether an employee is a qualified individual with a disability, a court should engage in an two-part inquiry and determine if the employee: "(1) satisfies the requisite skill, experience, education, and other job-related requirements of his employment position, and

10

(2) can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Budde v. Kane County Forest Pres.*, 597 F.3d 860, 862 (7th Cir. 2010) (citation omitted). The employee bears the burden of proof in establishing that he was capable of performing the essential functions of the position or that reasonable accommodations could or should have been fashioned that would have allowed him to perform the essential functions of the position. *Hammel*, 407 F.3d at 863.

"Reasonable accommodation" under the ADA may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices . . . and other similar accommodations . . . ." 42 U.S.C. § 12111(9)(B). However, "[a]n employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee." *Gratzl v. Offices of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, No. 08-3134, 2010 U.S. App. LEXIS 7144, at *13-14 (7th Cir. Apr. 7, 2010). Further, "the ADA does not require an employer to accommodate a disabled employee by making special, individualized training or supervision available in order to shepherd that employee through what is an essential and legitimate requirement of the job." *Hammel*, 407 F.3d at 867 (internal citations omitted).

In this case, IDHS concedes that Ramirez satisfies the first prong of the "qualified individual" inquiry, as "he possessed the experience and education to be an SSCT."[9] (R. 52, Def.'s Mem. at 9.) However, IDHS argues that Ramirez cannot satisfy the second prong of the inquiry, as "[t]he evidence is overwhelming" that he could not perform the essential functions of

---

[9] Ramirez asserts that he "substantially exceeds all of [the requirements] given his extensive educational background which includes an undergraduate degree in Sociology, four postgraduate degrees, two masters degrees, and an EdD Degree." (R. 55, Pl.'s Resp. at 7.)

the SSCT position with or without an accommodation. (*Id.* at 9-12.) Ramirez asserts that he could perform the essential functions of the SSCT position and that although he suffered discomfort while performing his duties, this discomfort was addressed by the adaptive equipment and he did not need anything else to perform the job.[10] (R. 53, Def.'s Facts ¶ 78; R. 55, Pl.'s Resp. at 7.) In addition, Ramirez argues that the SSCT position did not "require" him to "type at a minimum speed nor complete any minimum applications." (R. 55, Pl.'s Resp. at 7.)

Although there was no "minimum" typing or hourly application processing requirement, the SSCT position required Ramirez "to work effectively in a fast paced work environment in order to meet the requirements for [the] position." (R. 53, Def.'s Facts ¶ 22.) The record establishes that Ramirez was not able to meet this requirement as well as other essential functions of the position. Based on his January 2006 evaluation, Ramirez "needed improvement" in five of eight categories of IDHS's general expectations and did not meet 60% of the targeted objectives for the SSCT position. (R. 53, Def.'s Facts. ¶ 22.) Ramirez was issued a one-handed keyboard and an adjustable keyboard tray on April 5, 2006. (*Id.* ¶ 31.) In addition, on June 20 and 21, a larger monitor, magnifying device and magnifying software program was installed on his computer. (*Id.* ¶ 55.) His performance, however, did not improve even after he was given these accommodations. In her July 28 evaluation, Brandon found that Ramirez had "not developed nor demonstrated the skills, knowledge and understanding necessary for [the case

---

[10] Ramirez claims that he requested the first accommodation "because of the pain associated with typing, not because he was unable to type." (R. 55, Pl.'s Resp. at 7-8.)

worker] position."[11] (*Id.* ¶ 66.) Specifically, she indicated that Ramirez did not interview customers within a reasonable period of time, sent customers away without the correct applications, did not provide appropriate referrals to customers, put applications in his desk drawer without registering them and accumulated a backlog of work that had to be re-directed to other case workers. (*Id.* ¶¶ 66-67.) The record also indicates that Ramirez continued to require one-on-one training. (*Id.* ¶¶ 60, 63, 66.)

Ramirez bears the burden to prove that he was capable of performing the essential functions of the SSCT position or that reasonable accommodations could or should have been fashioned that would have allowed him to perform the essential functions of the position.[12] *See Hammel*, 407 F.3d at 863. Although Ramirez disagrees with his performance assessments, he does not present evidence to refute them or any other proof that he was able to perform the essential functions of the position. (*See* R. 55, Pl.'s Resp. at 7-8; R. 56, Pl.'s Facts ¶¶ 60, 63, 69.) Instead, Ramirez simply asserts that because he was assigned to intake and filing duties, he "could not progress." (R. 56, Pl.'s Facts ¶¶ 32, 69.) This assertion, however, is insufficient to defeat summary judgment. *See Wheeler*, 539 F.3d at 634 ("The non-moving party must show that there is evidence upon which a jury reasonably could find for the plaintiff."). For even if Ramirez had to file and work the intake desk, the record provides ample evidence that he also worked on SSCT duties and his performance of these duties continued to be deficient. (*See* R.

---

[11] These skills included explaining and interpreting program policy and eligibility requirements, assessing client eligibility and making appropriate referrals. (R. 53-1, Tab B, Ex. 2, SSCT Position Description.)

[12] Again, Ramirez asserts that he could perform the essential function of the position without accommodation and does not argue that reasonable accommodations could or should have been fashioned. (*See* R. 53, Def.'s Facts ¶ 78; R. 55, Pl.'s Resp. at 7.)

53, Def.'s Facts, ¶¶ 60, 63, 66-67.) IDHS was entitled to terminate Ramirez "solely on the basis of the [his] patent inability to perform his job in [a] manner that meets the essential requirement of that position." *Hammel*, 407 F.3d at 865 (citations omitted).

Accordingly, Ramirez fails to establish that he is a "qualified individual" under the ADA. As such, his claims end here. *See Gratzl*, 2010 U.S. App. LEXIS 7144 at *10 (plaintiff is not entitled to relief under the ADA because she was not able to perform the essential functions of her job and therefore was not a "qualified individual").

## CONCLUSION

For the foregoing reasons, IDHS's motion for summary judgment (R. 51) is granted. The Clerk of the Court is directed to enter judgment in favor of IDHS and against Ramirez.

Entered:

**Judge Ruben Castillo**
**United States District Court**

Dated: May 7, 2010